923 So.2d 158 (2005)
James A. BURROW
v.
DELTA CONTAINER CORPORATION.
No. 05-CA-316.
Court of Appeal of Louisiana, Fifth Circuit.
November 29, 2005.
*160 Frank A. Bruno, Attorney at Law, New Orleans, Louisiana, for Plaintiff/Appellee-2nd Appellant.
Pierre M. LeGrand, Ginger K. Deforest, Ungarino & Eckert, Metairie, Louisiana, for Defendant/Appellant.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS, and SUSAN M. CHEHARDY.
MARION F. EDWARDS, Judge.
Both plaintiff, James A. Burrow, and defendant, Delta Container Corporation, have appealed a judgment of the Office of Workers' Compensation Court in favor of Burrow, awarding temporary and total disability benefits and assessing penalties and attorney's fees.
On September 13, 2001, Burrow was injured in the course and scope of his employment with Delta when his hand was caught in a Revi-Cart machine, a device for folding and gluing corrugated board. He was taken to Ochsner Hospital and later tested positive for marijuana. All employment-related benefits were denied except for payment of the emergency room visit. Burrow filed his compensation claim, and trial was held. Following trial, the court found that Burrow had been injured in the course and scope of his employment but that he did not successfully rebut the presumption of intoxication under LSA-R.S. 23:1081.
Burrow filed a Motion For New Trial, which motion was subsequently granted by the trial court for "good cause shown." Several months later, a ruling in favor of Burrow was issued, finding that he had overcome the presumption of intoxication, awarding him temporary total disability benefits and all medical expenses. A penalty for failure to pay compensation was assessed.
Prior to trial, the parties stipulated as to the authenticity and admissibility of a number of items, including medical and drug screen documents. They further stipulated that the urine sample collection and testing procedure was done in compliance with the director's rules/regulations and provisions of the Louisiana Workers' Compensation Law. The parties also stipulated as to the average weekly wage and to the authenticity of employment records from other employers including Stone Container Corporation.
Delta is in the business of making boxes. Philip Arceneaux, operations manager at Delta, testified that Mark May is in charge of safety and environmental and quality assurance at Delta. The Revi-Cart machine in which Burrow was injured is manufactured in Italy and had been in use for about one year. The machine had been set up by representatives of Revi-Cart. *161 The only person who had been trained in its operation was Linda Chatelain but, at the time of the accident, Burrow was training to become a Revi-Cart operator. On the day of the accident, Arceneaux did not see Burrow until afterwards, when Burrow approached him and appeared ready to faint. Arceneaux brought Burrow to the hospital but did not notice whether he appeared to be intoxicated.
To operate the Revi-Cart, a box is set up and then run through, and adjustments are made constantly. The operator stands at the front, at a control panel, places boxes in the machine, and then walks along the side to make sure the boxes come out correctly. The Revi-Cart has a plexiglass wall and sliding doors along the walls which, if opened during operation, would normally cause the machine to shut off. However, after the machine was installed at Delta, Plant Supervisor Craig Hartzheim disengaged the doors from the shut-off mechanism. This was done because many of the boxes being made were running crooked or fishtailing and, upon consulting the manufacturer, the only person at Revi-Cart who spoke English recommended the disconnect on the operator's side. The only other solution was to leave the devices connected, close the door, get inside the machine as it was running, and then make the necessary adjustment.
Arceneaux was aware that the Revi-Cart instruction manual carries this statement: "It is severely [sic] forbidden to approach the machinery from its side during operation. Protection barriers have been installed on the machine for this reason." Included in Delta's own internal safety procedures is the written warning: "Do not tamper with any safety devices. Keep guards in place at all times.... Be sure all personnel are out and clear the machine before starting or opening it." However, Arceneaux testified that keeping Burrow in the machine, as when he was injured, does not violate this policy.
Mark May, the safety, environmental, and quality manager at Delta, testified that the supervisor and the production manager (Hartzheim) is in charge of the safety operation of each machine. May did not recall if he saw Burrow on the day of the accident and had no knowledge of whether Burrow was in the machine while it was running. He was aware of Delta's safety procedures but felt that there was a certain amount of discretion when it came to keeping guards in place. If the manufacturer said it could be done, then they could go ahead and do it. The warning that all personnel should be out and clear before starting a machine was written before the Revi-Cart was purchased. May had not read the Revi-Cart manual but had glanced through it. May had earlier concluded that the accident occurred because of improper training. However, at that time he did not know the results of the drug tests.
Jack Chauvin was a stacker for the Revi-Cart when the accident occurred. On the morning of the accident, Burrow appeared perfectly normal as they waited to punch in their time cards. Hartzheim was showing Virgil Barbarin how to straighten up boxes inside the machine, while Chauvin and Burrow were at the back of the machine catching and counting boxes. After taking a break, Barbarin joined Chauvin, and Burrow replaced Barbarin inside the Revi-Cart. At this time, Burrow still appeared to be alert, but Chauvin was busy and did not have an opportunity to closely observe him.
Virgil Barbarin testified that he also saw Burrow that morning, and he appeared to be normal. The machine was running when Barbarin was called over to straighten up the boxes, and he would have to move his hand in the machine a few inches *162 to push the box flap. At break time, Burrow drove Barbarin to get a sandwich and Burrow got a 16-ounce beer, which he drank. Burrow appeared to be fine. Burrow asked to swap positions with him, and Barbarin agreed. Probably less than one hour later, the accident occurred.
Linda Chatelain testified that, while she was training on the machine, the doors weren't connected but, later, the switch was removed. On the day of the accident, Burrow did not seem different. The boxes they were working on were small, and they would not stay straight. When she could not correct the problems as she had been shown to do by Revi-Cart, she called Hartzheim. He also attempted to make adjustments, then made the decision to place someone inside the machine. After the break, Barbarin and Burrow, who still appeared to be all right, switched places, and there was a jam. Burrow asked how to shut off the machine, and Chatelain told him a jam detector will shut the machine down when touched. Later, at about a quarter to ten, Burrow was bent over with his injury. Although Chatelain had seen him earlier, she did not watch his reflexes and coordination.
Burrow testified that, on the afternoon before the accident, he had one or two beers after work. Two or three nights before that, he had smoked a half or whole joint with a friend. However, those drugs and alcohol were not affecting his ability to work at the time of the accident. He arrived at work at 6:00 a.m. and remembered seeing Barbarin and talking to him. Burrow and Chatelain began to set up, and when the boxes came out crooked, Hartzheim came over to help. Ultimately, Hartzheim called Barbarin and Chauvin to help, and the machine was running slowly. At the 9:00 a.m. break, Burrow brought Barbarin to pick up a sandwich. Barbarin was mistaken in saying that Burrow bought a beer at that time, and all Barbarin got for him was cigarettes. When they returned from break, they switched positions at the machine. That morning, May came up to him and told him to be careful in there. The jam detector did not shut the machine off, but there was an emergency switch outside the machine door.
Because a couple of boxes got stuck on the compression belt, Burrow would lean over and make sure they went through by pushing the flaps in. He had to move his arm close to the pulley to do so. The accident happened when Burrow's hand "came down on the belt for a split second, and then it just carried it all of the way through and crushed my wrist." The belt popped and his arm was released. He was in great pain and walked to the front where he saw Arceneaux, who took him to the hospital.
Burrow suffered a severe crush injury and had broken bones in his hand and thumb. He had two surgeries, stayed in the hospital for six days, and has not been allowed to go back to work by his physician. His activities are limited, and he has no strength in his right arm. He is not able to perform his former employment.
On cross-examination, Burrow denied that he had been fired from a previous employment because he tested positive for marijuana and alcohol. Delta introduced a document indicating that Burrow had indeed been fired for substance abuse. Burrow further admitted that, although he stated on his pre-employment questionnaire that he was not using illegal drugs, he had, in fact, been regularly using marijuana once or twice a week for two years prior to the accident. There were times when he would not smoke for two or three months. He never smoked on the job.
Craig Hartzheim testified that he is the plant supervisor at Delta, and that Burrow was hired as a miscellaneous helper, working *163 wherever he was needed. Hartzheim was not there when the Revi-Cart was installed and had never read the manual. He was not aware of the manufacturer's warning against working inside the machine while it was operating. The plexiglass around the Revi-Cart was a requirement in Italy, where it is manufactured, not in the United States. At Delta, the doors to the machine remained closed when it was running but opened when adjustments had to be made. All of the machines at Delta are open, and the men work around movable parts all of the time. The jammer switch inside the Revi-Cart automatically stops the machine.
On the morning of the accident, Hartzheim saw Burrow when Burrow was directed where to start off that morning and Burrow did not appear to be impaired. When problems developed, Hartzheim was called over. After trying some adjustments, he determined that the boxes should be slapped straight as they were coming off the machine, so the machine was slowed. Burrow's hand, when he was at that position, would have been through the triangular shaped belt. Hartzheim himself had worked inside the machine for a while, and Barbarin had no problem working inside either. He did not see the accident. Since the accident, Hartzheim has worked inside the Revi-Cart four or five times but has not put anyone else in it.
A medical report to which the parties stipulated indicated the presence of 268 ng/ml of marijuana metabolites in Burrow's system when he was taken to the hospital.
The deposition and affidavit of Michael Frenzel, offered as an expert in accident investigation and safety program management, was admitted into evidence subject to certain objections by Delta. A Motion In Limine objecting to the admission of any of Frenzel's testimony or deposition under Daubert[1] was denied. Delta then filed objections to several portions of Frenzel's opinions. However, the court ultimately ruled that Frenzel was qualified to testify as an expert.
Following the unfavorable judgment, Burrow's Motion For New Trial alleged that there was no testimony that he was intoxicated before, at the time of, or even after, the accident. He further alleged that the evidence showed it was more likely than not caused by unsafe work practices of the employer. Burrow contended that there was no expert testimony as to the effect the amount of marijuana found in his system would have had on him.
In granting the new trial in favor of Burrow, the trial court determined that Delta intentionally allowed Burrow to work in a dangerous and unsafe environment and intentionally modified the Revi-Cart in violation of the manufacturer's safety recommendations; that it allowed employees to work in violation of its own safety rules, and improperly used the machine. The court also found that the testimony of witnesses was overwhelming that Burrow did not appear to be intoxicated or impaired at the time of the accident. The judgment concluded that Burrow had successfully overcome the presumption of intoxication and that the employer did not reasonably controvert the claim. Penalties and attorney's fees were awarded.
On appeal, Delta urges that the court erred: (1) in finding that Burrow presented sufficient evidence to overcome the presumption of intoxication; (2) in admitting *164 the expert testimony of Frenzel, which were simply his own subjective opinions; (3) in finding that Delta had not reasonably controverted the claim and in awarding penalties and attorney's fees; and (4) in not recognizing a credit to which Delta was entitled.
It is well settled that factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review.[2] Here, the trial court based its finding that Burrow had overcome the presumption of intoxication on the testimony of the co-employees, namely, that he did not appear to be intoxicated or impaired at the time of the accident. We note there is nothing in the record to establish that Burrow smoked marijuana on the date of, or on the night before, the accident. The testimony of the witnesses who observed him was unanimous that Burrow appeared to be normal and not intoxicated at the time of the accident. Several cases in this and other circuits have held such testimony sufficient to overcome the statutory presumption.[3] Even without considering the testimony of Frenzel, our review of the record discloses no error by the trial court on this issue, and we agree that the evidence in the record supports a finding that Burrow was not acting under the influence of the drug at the time of the accident.
Further, there is sufficient evidence in the record to support the conclusion by the trial court that Delta intentionally modified the machine in violation of the manufacturer's recommendations, allowed Burrow to work in violation of its own safety rules, and improperly used the machine. Delta's safety procedures warned against tampering with safety devices and required that personnel are clear of machines before operation. Neither May, Delta's safety director, nor the plant supervisor, Hartzheim, had read the machine manual to determine the safety of their operational methods and could not say if anyone in the plant had done so. May testified that, in the past, he himself had bypassed certain safety "things" in order to keep the machines running. Hartzheim, who ran the operation that day, was not aware of the manufacturer's warning. Without resort to the evidence of Frenzel, the testimony of these Delta representatives alone establishes that Delta placed Burrow in a dangerous and unsafe work environment and used the machines improperly.
Because of our findings above, we do not consider the question of the admissibility of Frenzel's testimony. Even without it, there was a preponderance of evidence to support the conclusion of the trial court that Burrow had overcome the statutory presumption.
Delta contends the court erred in determining it had not reasonably controverted the claim; Burrow urges that the amount of penalties and attorney's fees awarded was insufficient. Under LSA-R.S. 23:1201(F), failure to pay compensation in a timely manner will result in the payment of penalties and attorney's fees unless the claim is reasonably controverted or is the result of conditions over which the employer had no control. The determination of whether an employer should be cast with penalties and attorney's fees *165 in a workers' compensation proceeding is a question of fact that will not be disturbed on appeal absent manifest error.[4] The trial judge's determinations may not be reversed if they are reasonable in view of the record in its entirety.[5]
To determine whether the claimant's right has been reasonably controverted, thereby precluding the imposition of penalties and attorney's fees under LSA-R.S. 23:1201, a court must ascertain whether the employer or his insurer engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed.[6]
Although the Workers' Compensation Act is to be liberally construed in regard to benefits, penal statutes are to be strictly construed....
The fact that an employer is subjectively motivated to avoid paying compensation is not determinative. Neither is the fact that an employer loses a disputed claim.... The employer must adequately investigate the claim, and the crucial inquiry is whether the employer had an articulable and objective reason for denying or discontinuing benefits at the time it took that action.[7]
Whether the employer's act is arbitrary, capricious or without probable cause depends upon the facts existing and known to the employer at the time its decision as to benefits was made.[8] Statutes imposing liability for penalties and attorney's fees are penal in nature and must be strictly construed to prevent an employer from being penalized for relying in good faith on valid defenses.[9]
On considering the present circumstances, we find that the employer did reasonably controvert the claim in relying on the presumption of intoxication. Even the workers' compensation judge initially found in favor of Delta on these grounds. Although Delta ultimately lost the controversy, this defense was a serious issue about which reasonable minds could differ.[10] Therefore, we find the court erred in assessing these penalties and attorney's fees. Further, in accordance with LSA-R.S. 23:1212, Delta proved at trial that it is entitled to a credit for all amounts paid by it for past medical expenses.
For the foregoing reasons, the judgment is reversed insofar as it grants penalties and attorney's fees. We further amend the judgment to include a credit for all medical expenses previously paid by Delta. In all other respects, the judgment is affirmed. Costs of the appeal are taxed to Delta.
*166 REVERSED IN PART; AFFIRMED AS AMENDED.
NOTES
[1] Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[2] Banks v. Indus. Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551, 556.
[3] See, Sweeden v. Hunting Tubular Threading, Inc., 2001-724 (La.App. 5 Cir.12/12/01), 806 So.2d 728; Forrester v. New Orleans Iron Works, XXXX-XXXX (La.App. 5 Cir. 2/23/04), 869 So.2d 216; Boise Cascade Corp. v. Dean, 99-1356 (La.App. 3 Cir.5/3/00), 767 So.2d 76, 80, writ denied, 2000-2505 (La.11/13/00), 774 So.2d 146
[4] Saragusa v. Auto Craft, Inc., 04-316 (La. App. 5 Cir. 10/12/04), 886 So.2d 548.
[5] Camardelle v. K Mart Corp., 04-224 (La.App. 5 Cir. 7/27/04), 880 So.2d 90; Sears v. Berg, Inc., 99-457 (La.App. 5 Cir. 9/28/99), 742 So.2d 760.
[6] Brown v. Texas-LA Cartage, Inc., 98-1063 (La.12/1/98) 721 So.2d 885, 890.
[7] Williams v. Rush Masonry, Inc., 98-2271 (La.6/29/99), 737 So.2d 41, 46 (citations omitted).
[8] Chateau v. City of Kenner, 97-1006 (La.App. 5 Cir. 5/13/98), 712 So.2d 256, writ denied, 98-1545 (La.9/18/98), 724 So.2d 769.
[9] Id.
[10] See, e.g., Robinson v. Apria Healthcare, Inc., 38,438 (La.App. 2 Cir. 5/27/04), 874 So.2d 418,.